IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                  Plaintiff,<br><br>v.<br><br>Joseph Ronnie Weathington,<br><br>                  Defendant. | Case No. MJ-22-04377 PCT CDB<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

### I.  Background

On June 26, 2021, Defendant was arrested and cited with one count of maintaining, occupying, and using a residence on National Forest System lands without a special use authorization, in violation of 36 C.F.R 261.10(b), and one count of unlawfully going into and being upon an area of the forest when prohibited, in violation of 36 C.F.R 261.52(e), on or about June 26, 2021. *See United States v. Joseph Ronnie Weathington*, MJ-21-04183 PCT CDB. Defendant's initial appearance was held on August 28, 2021, and he was appointed counsel from the Federal Public Defender's Office. Defendant was temporarily detained.

A status hearing was conducted on June 30, 2021, at which Defendant advised the Court that he wished to represent himself. The Court found Defendant knowingly and voluntarily waived his right to counsel and could proceed without counsel. Defendant was released on his own recognizance with conditions. (*Id*. at ECF No. 6). At a status hearing on July 9, 2021, Defendant refused to comply with the District of Arizona General Order requiring participants in federal courtrooms wear a mask in the courtroom, due to the

COVID pandemic. Defendant was informed that if he did not appear in the courtroom for his hearing a warrant would issue for his failure to appear. Defendant continued to refuse to wear a mask. The Court issued a warrant for failure to appear and Defendant was taken into custody. (*Id*. at ECF No. 7).

The Court re-appointed counsel for Defendant at a status hearing on July 12, 2021. The United States offered Defendant a six-month deferred prosecution, and Defendant was released from custody. (*Id*. at ECF No. 9). On October 8, 2021, the United States filed a motion to dismiss Defendant's citations without prejudice. The Court granted the motion on October 12, 2021. (*Id*. at ECF Nos. 11 &12.)

On September 12, 2022, Defendant was cited for the offense of unlawfully leaving a fire without completely extinguishing it, in violation of 36 C.F.R. 261.5(d). (ECF No. 1). This citation was predicated on events occurring on July 4, 2022. Counsel from the Federal Public Defender's Office was appointed to represent Defendant. At Defendant's initial appearance on October 18, 2022, Defendant was continued on release with conditions. (ECF No. 7).

Status hearings were subsequently held on December 15, 2022, March 14, 2023, April 13, 2023, and May 12, 2023. (ECF Nos. 12-15). On May 12, 2023, defense counsel advised the Court of a breakdown in the attorney-client relationship and the Court granted an oral motion to withdraw as defense counsel. As the Court was contemplating future hearings and inquiring about Defendant's availability, he stated he was a flight risk and would not return to court. (ECF No. 15). The United States advised Defendant was still residing in the forest, which was a violation of the release conditions. (*Id.*). Noting that Defendant was without counsel, the Court gave Defendant an opportunity to withdraw his statements regarding being a flight risk, and Defendant did not withdraw this statement. The Court ordered Defendant be taken into custody. New counsel was appointed to represent Defendant.

On June 20, 2023, the United States filed a six count information in this matter, which included the charges dismissed in the 2021 case. The information included two

charges relating events occurring on July 4, 2022, and a charge regarding conduct from January 2, 2023, to March 24, 2023. (ECF No. 18). Specifically, the information filed June 20, 2023, charged Defendant with three counts of maintaining, occupying, and using a residence on National Forest System lands without a special use authorization, in violation of 36 C.F.R 261.10(b) (Counts 1-3); one count of unlawfully going into and being upon an area of the forest closed due to fire restrictions, in violation of 36 C.F.R 261.52(e) (Count 4); one count of causing timber, trees, brush, and grass to burn without a permit, in violation of 36 C.F.R 261.5(c) (Count 5); and one count of unlawfully leaving a fire without completely extinguishing it, in violation of 36 C.F.R. 261.5(d) (Count 6). The Information alleges that on June 26, 2021, during a forest closure, Defendant was residing on the Coconino National Forest near Forest Road ("FR") 296 and refused to leave. On July 4, 2022, Defendant was alleged to be residing on the Coconino National Forest south of Flagstaff near FR 700. Defendant was alleged to have started a campfire at this location and left camp without properly extinguishing the fire, and the unextinguished campfire was alleged to have caused a wildland fire (the "Schoolhouse Fire") which ultimately burned a half-acre of forest land. Defendant was alleged to have been residing on the Coconino National Forest near Walnut Canyon National Monument near FR 303 from approximately January 2, 2023, through March 24, 2023. Each of the charges stated in the Information is a Class B misdemeanor punishable by a term of imprisonment of up to six months and up to a $5,000.00 fine. The offenses are probation eligible, with up to five years of probation.

A bench trial was conducted on August 3 and 4, 2023. The parties stipulated to the admission of several exhibits: the Government's Exhibit 1 (Coconino National Forest Stage 3 Forest Closure Order); the Government's Exhibits 9, 27, 28 (Photographs – Schoolhouse Fire); and the Government's Exhibits 11, 12, 13, 15, 17, and 18 (body camera video from the June 26, 2021, and July 4, 2022, incidents) as to authenticity and foundation. Defendant reserved any hearsay objections for the course of trial.

The United States called four witnesses at trial: United States Forest Service ("USFS") Law Enforcement Officer Phelan Whitehair, who contacted Defendant on June

26, 2021, and July 4, 2022; National Park Service ("NPS") Ranger Cullen Kirk, who contacted Defendant on January 2, 2023, and March 25, 2023; USFS Fire Protection Specialist Andrew Hostad, who worked to suppress and investigate the Schoolhouse Fire on July 4, 2022, and who had direct contact with Defendant; and USFS employee Tobias Hutchens. (ECF No. 26). Defendant did not call any witnesses and chose not to testify.

Defendant's presence during trial was addressed on the first day of trial when defense counsel advised the Court that Defendant wanted to leave the courtroom. The request was initially denied because Defendant appeared appropriately engaged and interested in the proceedings. At the next recess the Court made a record of Defendant's request and advised him of his right to be present at trial and advised his presence could be advantageous to him. The Defendant elected to be present for the remainder of the day.

On the second day of trial the United States published Plaintiff's Exhibit 15, body camera footage of Ranger Kirk. As the video was played Defendant became obviously distressed and the Court called an immediate recess. Defendant advised the assigned deputy United States Marshals that he wanted to go back to the detention facility and did not want to be present for the remainder of the trial. The Court granted this request and waived Defendant's presence for the remainder of the day.

## II.   Findings of Fact and Conclusions of Law

Having considered all the evidence introduced at trial, the arguments of counsel, and the governing law, the Court makes the following findings of fact and conclusions of law.

### A.   Findings of Fact

The following findings of fact were adduced from the exhibits admitted into evidence by the United States and the testimony of the United States' witnesses.

1. Camping is generally considered as a short recreational stay on the forest.

2. Residential use of the forest is not recreational in nature and is considered a long term stay on the forest. A permit is required to make a residence on the National Forest. A

residence does not need be fixed and can be a temporary structure such as a tent or recreational vehicle.

2. The Coconino National Forest is under an order which allows people to camp recreationally on the National Forest for fourteen days. After fourteen days campers must leave the Coconino National Forest and not return for thirty days.

3. The fourteen-day order applies to camping for recreational purposes and is different from the conduct of residing on the National Forest.

4. The charge of residing on the National Forest does not require a minimum stay. A person can be in violation of this offense on the first day of maintaining, occupying, and using a residence on the National Forest.

5. On June 26, 2021, Whitehair was on duty in full uniform and driving a fully marked patrol vehicle on the Coconino National Forest.

6. Whitehair is a USFS law enforcement officer. He has worked for the USFS for 21 years and worked as a wildland firefighter for three of those years.

7. The Coconino National Forest is within the jurisdiction of the National Forest Service as well as within the jurisdiction of the District of Arizona.

8. On June 26, 2021, the Coconino National Forest was in Stage 3 Fire Restrictions. This is the most restrictive stage put into effect by the USFS and is based on the severity of fire danger on the forest. Stage 3 Fire Restrictions prohibit all individuals from being on the National Forest without a permit. This forest closure was in effect from June 23, 2021, at 8 a.m. to September 1, 2021.

9. Notice of the Stage 3 Fire Restriction and forest closure was posted in the Coconino National Forest Offices, on the Coconino National Forest website, on information boards within the forest, and published in the media.

10. Whitehair responded to an area off FR 296 near Lower Lake Mary, having received notice of the presence of an individual in the Coconino National Forest.

11. When Whitehair arrived on scene, he joined other law enforcement officers from different agencies who were already with Defendant.

12. Defendant was on land within the Coconino National Forest which was closed by order of the Forest Supervisor as a result of the Stage 3 Fire Restrictions.

13. Defendant did not have a permit to be in the closed area.

14. Defendant did not have a permit to reside on the National Forest.

15. Whitehair observed the presence of a camp, consisting of a group of small distinct areas including a fire ring and apparent cooking area, a pile of wood, a bicycle, a sleeping area containing a tent covered by a brown tarp, and storage type areas comprised of two piles of personal belongings covered with tarps. The fire ring was covered with a cooking grate, and next to the fire ring were food and beverage containers and a lantern in a can.

16. Three wire baskets were affixed to the bicycle. The baskets contained personal belongings. There was no other means of transportation in or at the campsite.

17. The piles of personal belongings were covered by tarps. Whitehair described these belongings as being atypical in a recreational camp site.

18. The tent in the sleeping area was an "Ozark Trail" brand tent. Whitehair identified this as a brand of tents provided by a charitable organization in Flagstaff. He further testified that this brand of tent is frequently used by those who are residing, rather than recreating, in the Coconino National Forest. The tent was covered in several layers of tarps. Whitehair testified the layering of tarps on the tent was typical of others he had encountered with regard to individuals residing in the forest.

19. A shopping cart at the entrance to the tent contained personal belongings, including a bath towel. Whitehair explained that a shopping cart is an atypical item for recreational campers. Cardboard was laid out on the ground in front of the tent, which is not seen with recreational campers.

20. A sleeping bag, beverage containers, and canned food were found inside the tent.

21. The camp site was heavily trampled compared to that of the vegetation in the surrounding area. Whitehair testified this was indicative of a long-term occupancy.

22. Whitehair did not observe typical recreational camping equipment such as fishing poles, kayaks, canoes, or coolers.

23. Whitehair informed Defendant that the forest was closed and told him he needed to leave the forest. Whitehair told Defendant he could not live in the forest.

24. Defendant told Whitehair: "I can't live in Phoenix either, because they don't want homeless people on the streets." (Pl. Ex. 11.)

25. Whitehair offered Defendant a ride to a local shelter. Defendant declined.

26. Defendant admitted recently building campfires and stated he understood he was not allowed to build campfires. (*Id*.)

27. Defendant refused to leave the forest multiple times and asked to be arrested because he had nowhere else to go.

28. Defendant was arrested and cited on charges of residing on the National Forest and being present in a closed area of the National Forest without a permit.

29. On July 4, 2022, Whitehair was on duty in full uniform, driving a fully marked patrol vehicle.

30. Whitehair responded to a wildfire south of Flagstaff on FR 700, within the Coconino National Forest. The USFS later named the fire the Schoolhouse Fire.[1]

31. The Schoolhouse Fire was located in a small flat area approximately 200 yards uphill from FR 700 and there were no roads or trails around the fire.

32. The Schoolhouse Fire was within one mile of two developed neighborhoods, posing a significant threat to those communities, and near Interstate 17, with the potential to impact or close Interstate 17.

33. Whitehair did not directly investigate the fire and did not work on suppressing the fire. Whitehair did make preliminary observations at the scene based on his training and experience. His observations included the overall burn area and burn pattern, burn indicators, whether any obvious causes of the fire could be excluded, and noting the direction of the wind and smoke.

---

[1] There were no fire restriction in effect for the Coconino National Forest on July 4, 2022.

34. On July 4, 2022, the weather was sunny and warm. Light winds were from the southwest blowing eastward. Smoke was blowing eastward from the area of the fire.

35. A "campfire" is generally defined as a fire that is not contained within a building, mobile home, or mounted on a vehicle. Its primary purposes are cooking, recreational use, lighting, warmth, or ceremonial. It is a defined term under the Code of Federal Regulations (36 C.F.R. § 261.2). Campfires that appear to be extinguished can ignite days later. Campfires can become wildfires.

36. A "wildfire" is defined as an uncontrolled fire that is spreading across the landscape, usually in forests or grasslands. Wildfires can destroy properties, cause loss of life, damage natural resources such as wildland habitat, and adversely impact water quality.

37. Lightning strikes are the most prevalent cause of naturally-ignited wildfires.

38. At the scene of the fire Whitehair observed no electrical lines overhead, no railroads or train tracks, no evidence of children in the area, no private vehicles or people in the area. Based on Whitehair's observations, there was no obvious evidence of a naturally caused fire, i.e., there was no evidence of lightning strikes.

39. Whitehair noted the direction of the wind and noticed the fire was burning in the direction of the wind. While walking around the area he noted the wind appeared to blow the fire away from the area of an obvious fire ring.

40. The Schoolhouse Fire was investigated by Andrew Hostad, who has worked for the NFS for 13 years. Hostad was one of the firefighters suppressing the fire as well as a specialist investigating the cause of the fire. At that time Hostad was a Forest Protection Officer and Fire Prevention Technician.

41. Hostad arrived at the scene of the Schoolhouse Fire as part of the fire suppression effort. Hostad arrived within four to five minutes after the first fire-fighting resources arrived on scene.

42. Hostad used the same investigative methods as Whitehair (excluding causes, observing burn patterns and indicators, and observing the direction of the wind and smoke).

1  He also took photos in all cardinal directions and marked fire burn indicators which showed
2  the angle of char in the area.²

3  44. Hostad excluded lightning strikes as a potential cause of the fire. He also
4  excluded vehicles, cigarette smoking, aircraft or drones, railroads, trains, incendiary
5  devices (aside from matches), children playing with fire, blasting, structures, fireworks,
6  welding, cutting, grinding, pest control activities, powerlines, refracted glass, and target
7  shooting.

8  45. There were no prescribed burns being conducted in the area.

9  46. A campsite was located within the area of the fire. The campsite was located on
10  an exposed bench and was not insulated from the wind.

11  47. Burn patterns and charred ground extended eastward from a hot campfire ring
12  located in the campsite. This pattern was in a V-shape. The campfire was located at the
13  "heel" of the V-pattern.

14  48. The campfire was surrounded by a ring of rocks. The contents of the fire ring
15  were still hot and burning when USFS employees arrived. The wildfire was burning
16  eastward when USFS employees arrived.

17  49. The campfire was still hot at the time of Hostad's investigation. The ash within
18  the fire ring was white, which indicated the fire was not completely extinguished.

19  50. No individuals or vehicles were present at the campsite.

20  51. No people, other than USFS employees, or other campsites were present in the
21  area of the fire.

22  52. The campsite in which the campfire was located had three distinct areas: a
23  cooking area around the fire ring, a sleeping area, and a storage area.

24  53. The campsite's cooking area included the fire ring that was at the base of the
25  Schoolhouse Fire burn path. A metal cooking grate was on top of the fire ring. A small pot
26  and plastic gallon jug were located near the fire ring. A box of matches was located on the

---

² Fire burn indicators are essentially distinct marks on an object where fire has impacted the object as it spreads across the landscape.

edge of the fire ring. The cooking area of the campsite was burned by the Schoolhouse Fire.

52. The campsite sleeping area was surrounded by a stand of oak trees. The sleeping area contained a bedroll, sleeping bag, and personal items wrapped in tarps. The personal items consisted of bags, backpacks, and a duffel bag. A shirt was hanging in a tree. This area was approximately 50 yards away from the Schoolhouse Fire burn area, and was not burned.

53. The campsite storage area contained various food items. This area was approximately 50 yards away from the Schoolhouse Fire burn area and was not burned.

54. Also found in the campsite were various items, including a bicycle basket.

55. The campsite sleeping and storage areas were in the path of the fire, so to prevent their destruction all of the above items were collected by the crew suppressing the fire. The property collected from campsite almost filled the beds of two USFS trucks.

56. Defendant arrived at the campsite from the north on FR 700 as the fire suppression and investigation were underway and spoke with Hostad.

57. Defendant acknowledged there was a fire at his camp. He stated, "How did the fire … did you guys … was someone out there and saw how many acres I burned?" He further stated: "You caught mine fast," alluding to the fire.

58. Defendant noted the direction of the wind, indicating the fire started in the fire ring and was burning towards his items in the sleeping and storage areas of the campsite.

59. Defendant was concerned about his personal property after noting that his property was in the path of the fire. He was relieved to learn USFS personnel were able to save his property.

60. Defendant admitted the camp was his and that he owned all the items found at the campsite.

61. Defendant admitted being at his camp that morning and starting a campfire to make food and coffee, stating it was the third fire he'd started at this location. He stated that he poured water on the campfire and stayed in camp for another three hours after

dousing the fire with water. During that time Defendant was cleaning and taking the baskets off his bicycle. Defendant stated he then left camp on his bicycle for approximately 40 minutes. He returned to the area after seeing several fire trucks and USFS trucks heading towards his camp.

62. Defendant admitted he started the campfire with matches. When Whitehair showed Defendant the box of matches recovered from a protected edge of the campfire ring, Defendant admitted the matches were his and he used the matches to start the campfire.

63. Regarding his whereabouts that morning, Defendant told Whitehair he "had nothing to hide, full transparency."

64. Defendant mentioned the previous contact with Whitehair on June 26, 2021.

65. Defendant was concerned with getting his property back from USFS personnel. Defendant provided Whitehair with the business card of a temporary employment services agency, indicating it was the best mailing address for Defendant. Defendant did not offer or provide any other address at which he could receive mail. All of the items collected from the scene of the fire were subsequently returned to Defendant.

66. The Schoolhouse fire was contained in approximately 1.5 hours, and in three days the fire was fully controlled, i.e., no longer emitting heat or smoke. The Schoolhouse fire burned 0.5 acre of land.

67. The Schoolhouse Fire originated in Defendant's campfire.

68. Defendant did not completely extinguish his campfire and left it unattended.

69. The Schoolhouse Fire burned grass, Ponderosa Pine, and stands of oak brush.

70. The Schoolhouse Fire was a wildfire.

71. On July 4, 2022, Defendant did not have a permit to start a wildfire.

72. On January 2, 2023, Kirk was patrolling FR 303. This road surrounds and runs parallel to Walnut Canyon National Monument. Walnut Canyon National Monument is managed by the National Park Service.

73. Kirk learned from a colleague that an individual, Defendant, was living in a specific location on the forest along FR 303.

74. On January 2, 2023, the weather was overcast and there was snow on the ground. A heavy snowstorm was predicted.

75. Kirk was concerned for the safety of anyone staying or residing in the forest due to the low temperatures and predicted storm.

76. Kirk made contacted with Defendant off FR 303, where Defendant appeared to be living in the forest. Defendant was near a tent in a clearing of trees. Kirk recognized Defendant from a prior contact.

77. Defendant's tent was pitched under a tree, covered in several layers of tarps. His camp consisted of a campfire ring and personal effects. No vehicles or modes of transportation were present in the area.

78. Defendant admitted to Ranger Kirk that he was living in the forest that winter and stated: "Well you might as well take me to jail." Defendant stated it would be impossible for him to move his camp given the weather conditions. Kirk informed Defendant he would have to leave the forest, but that Kirk would not take him to jail.

79. When Kirk expressed concern about Defendant's welfare given the weather conditions, Defendant stated he had been living in the forest for the last three winters.

80. Kirk advised Defendant to leave the forest and offered Defendant some time to figure-out where to go. Kirk advised that he would return to the campsite and he hoped that on his return Defendant would not be there.

81. On February 7, 2023, Kirk was patrolling the same area he had patrolled on January 2, 2023. Kirk drove to Defendant's campsite to see if he had vacated the area.

82. Defendant's camp, including a tent, were present in the same spot as on January 2, 2023. Kirk observed the same tarps strung up over the tent, a fire ring with ash and burned wood, and personal belongings. The camp did not appear abandoned.

83. Kirk also observed somewhat fresh tracks in the packed snow and ice, indicating ingress and egress from all areas of the camp.

84. Kirk did not observe Defendant at the camp.

85. On March 25, 2023, Kirk again visited the campsite. Kirk planned to inform Defendant of an impending forest closure which would prohibit all camping in the area.

86. Kirk found Defendant in the camp and observed the same items previously seen in the camp, although some items appeared to have been moved. The tent was in the same location as on January 2, 2022.

87. Kirk reiterated to Defendant that he was concerned about Defendant's wellbeing and safety in adverse weather.

88. Defendant said that he would take his camp down and leave the area before April.

89. Based on Ranger Kirk's observations, Defendant was living in the forest for a minimum of three months.

90. Defendant admitted to living in the forest for a "quarter," referring to a quarter of the year, consistent with Kirk's observations in January, February, and March of 2022.

91. In January, February, and March of 2022 Defendant was subject to release conditions in *United States v. Joseph Ronnie Weathington*, MJ-21-04183-001-PCT-CDB, prohibiting him from being present in any National Forest in Northern Arizona. (Kirk was not aware of this restriction).

92. On April 9, 2023, Kirk attempted to contact Defendant at the same campsite. Kirk did not see Defendant and the camp was largely disbanded, although Kirk observed a tin can, a tarp, and a few pieces of firewood.

93. Defendant admitted to Whitehair that he had resided in the forest intermittently for several months.

94. Defendant admitted Kirk that he had resided in the forest for three winters, and for a "quarter" of a year.

95. Per the testimony of USFS employee Tobias Hutchens, Defendant never applied for or obtained a special use permit which would have allowed him to reside in the Coconino National Forest.

95. Hutchens testified there are no permits that would allow a private individual to burn timber, trees, brush, and grass in the Coconino National Forest.

Additionally, any finding of fact deemed a conclusion of law is so adopted.

### III. Evidentiary Ruling at Trial

As the United States was preparing to elicit testimony from Hostad regarding the cause and origin of the Schoolhouse Fire, Defense counsel asserted an objection to the testimony pursuant to Rule 702 of the Federal Rules of Evidence.

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Defendant asserted the United States was preparing to admit expert testimony from Hostad although the United States had not previously disclose Hostad as an expert witness. Defendant argued that Hostad's training as a fire investigator brought any testimony regarding the cause and origin of the Schoolhouse Fire within the scope of Rule 702, due to his specialized and technical knowledge.

The United States asserted Hostad was a lay witness pursuant to the provisions of Rule 701 of the Federal Rules of Evidence, arguing Hostad was testifying only as to his own perceptions of what he observed at the scene of Defendant's campsite and the Schoolhouse Fire. (ECF No. 21).

Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;

      (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
      (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The United States maintained Hostad's conclusions regarding the origin and cause of the Schoolhouse Fire were no different than what a lay person would perceive and that his conclusions were the result of common sense. The United States noted Hostad's reasoning as to the origin of the fire included excluding potential ignition sources, the absence of which would be obvious to the lay observer, such as power lines, railroad tracks in the area, children in the area, vehicles, tools, or smokers. The United States argued an individual without technical knowledge could make these observations and arrive at a similar conclusion to that reached by Hostad.

After hearing argument on the objection, the Court noted that, with respect to the classification of Hostad's testimony as lay or expert testimony, the distinction was less clear when a fact witness also possessed specialized knowledge and training. Although Hostad could articulate his investigation as a lay witness, he was also a Forest Fire Prevention Officer and Fire Prevention Specialist and had significant training in wildland fire management. Additionally, the Court noted both Rule 701 and Rule 702 focus on the testimony being offered rather than the witness offering the testimony. Hostad was a fire fighter and was an on-scene fire investigator. Hostad was actively involved in the investigation of the fire and suppression of the fire, rather than an expert testifying to evidence collected by others. Additionally, Hostad's method of investigation of the fire's cause and origin mirrored Whitehair's method of investigation, with regard to the observations each made at the scene of the Schoolhouse Fire, although Hostad also took photographs, marked fire burn indicators with flags, and hand-sketched a map of the fire.

Relying on *United States v. Rodriquez*, 971 F.3d 1005 (9th Cir. 2020), and *United States. v. Perez*, 962 F.3d 420 (9th Cir. 2020), the Court concluded Hostad's testimony was admissible under Rule 701, provided a proper foundation for the testimony was established. The Court qualified this ruling with the provision that Hostad could not opine regarding

the fire's origin or source based on speculation, hearsay, or redefining the obvious. The Court also concluded Hostad's testimony related to personally-observed facts and was not intended solely to implicate Defendant. Additionally, the Court determined Hostad's testimony was credible and reliable.

### IV.    Conclusions of law

At trial Defendant argued he should be found not guilty of the charged violations because the United States did not prove the offenses beyond a reasonable doubt.

Based on the testimony and evidence presented at trial, including Defendant's admissions to the law enforcement officers who testified, and the evidence to which Defendant stipulated, the Court makes the following conclusions of law.

1. Although the United States charged Defendant in the conjunctive form, the United States was only required to prove the offenses in the disjunctive. *United States v. Abascal*, 564 F.2d 821, 832 (9th Cir. 1977) ("The government may charge in the conjunctive form that which the statutes denounce disjunctively, and evidence supporting any one of the charges will support a guilty verdict.").

2. As a matter of law, a violation of 36 C.F.R § 261.10(b), maintaining, occupying, and using a residence on National Forest System lands without a special use authorization; and a violation of 36 C.F.R § 261.52(e), going into and being upon an area of the forest when prohibited; and a violation of 36 C.F.R. § 261.5(c), causing timber, trees, brush, and grass to burn without a permit; and a violation of 36 C.F.R. § 261.5(d), leaving a fire without completely extinguishing it, are all strict liability offenses. This conclusion is based, *inter alia*, on the language of 36 C.F.R. § 261.1(c), which provides that "[u]nless an offense set out in this part *specifies* that intent is required, intent is not an element of any offense ..."[3] (emphasis added). This conclusion is also based on the holdings of the federal

---

[3] Although intent was found to be required for a violation of 18 U.S.C. § 1856 ("suffering fire kindled on federal land to burn or spread unattended") in *United States v. Launder*, 743 F.2d 686 (9th Cir. 1984), subsection (c) was added to § 261.1 in 2008, after *Lauder* was decided. The purpose of adding subsection (c) was "to clarify that unless criminal intent ('mens rea') is expressly required in the provision setting forth the offense, strict liability would apply," because "the general presumption that some guilty intent or purpose is required does not apply to 'public welfare

courts finding violations of the subject and related USFS regulations. *See also United States v. Morissette*, 342 U.S. 246, 256 (1952) (holding violation of certain regulations may be regarded as offenses against the United States' authority, and therefore not requiring intent as an element of the offense); *United States v. Kent*, 945 F.2d 1441 (9th Cir. 1990) (finding no mens rea requirement in a USFS regulation prohibiting the use of Forest Service lands for residential purposes without authorization); *United States v. Lesh*, 2021 WL 4941013, at *3 (D. Colo. Oct. 22, 2021) (collecting cases). Additionally, the Court concludes that, as a matter of law, sufficient evidence was provided at trial to establish intent to violate these sections under a negligent or reckless mens rea.

3. As a matter of law, the Court concludes the United States did not need to prove that Defendant was residing on the Coconino National Forest for an extended period of time to be found in violation of 36 C.F.R. § 261.10(b), because the regulations prohibits this conduct on the first day someone maintains, occupies, and uses a residence on the National Forest.

4. The Court concludes that, based on the facts found *supra*, Defendant maintained and occupied as his residence a camp located on the Coconino National Forest on June 26, 2021, and as a matter of law this was in violation of 36 C.F.R. § 261.10(b), and Defendant is guilty of Count 1 of the Information.

5. The Court concludes that, based on the facts found *supra*, Defendant maintained, occupied, and used as a residence a camp on the Coconino National Forest on July 4, 2022, and as a matter of law this was in violation of 36 C.F.R. § 261.10(b), and Defendant is guilty of Count 2 of the Information.

6. The Court concludes that, based on the facts found *supra*, Defendant maintained, occupied, and used as a residence a camp on the Coconino National Forest from at least

---

offenses.'" Clarifying Prohibitions for Failure To Maintain Control of Fires That Damage National Forest System Lands, 73 Fed. Reg. 30305-01 (May 27, 2008)), codified at 26 C.F.R. § 261.1(c) (*available at* 2008 WL 2164050). "The clarification to section 261.1 states the agency's long-standing interpretation of its criminal prohibitions as public welfare offenses and confirms that, as such, they generally are strict liability offenses. Proof of criminal intent is required only where expressly provided by the specific prohibition." *Id.*

January 2, 2023, through March 24, 2023, and as a matter of law this was in violation of 36 C.F.R. § 261.10(b), and Defendant is guilty of Count 3 of the Information.

7. The Court concludes that, based on the facts found *supra*, Defendant went into and was on an area of the forest when prohibited to do so by order, and as a matter of law this was in violation of 36 C.F.R. § 261.52(e), and Defendant is guilty of Count 4 of the Information.

8. The Court concludes that, based on the facts found *supra*, Defendant caused timber, trees, brush, and grass to burn in a National Forest without a permit, in violation of 36 C.F.R. § 261.5(c), and Defendant is guilty of Count 5 of the Information.

9. The Court concludes that, based on the facts found *supra*, Defendant unlawfully left a fire without completely extinguishing it, in violation of 36 C.F.R. § 261.5(d), and Defendant is guilty of Count 6 of the Information.

Dated this 21st day of August, 2023.

_____
Camille D. Bibles
United States Magistrate Judge